IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEVEN ARTHUR LATULIPPE,
M.D.,

          Plaintiff,

v.

KATHLEEN HARDER, in her official
capacity as Chair of the Oregon Medical
Board; SAURABH GUPTA, in her
official capacity as Vice Chair of the
Oregon Medical Board; ERIN CRAMER,
in his official capacity as Secretary/
Physician Assistant Member of the
Oregon Medical Board; ROBERT M.
CAHN, in his official capacity as a
member of the Oregon Medical Board;
JAMES K. LACE, in his official
capacity as a member of the Oregon
Medical Board; CHARLOTTE LIN,
in her official capacity as a member of
the Oregon Medical Board; PATTI
LOUIE, in her official capacity as a
member of the Oregon Medical Board;
JENNIFER L. LYONS, in her official
capacity as a member of the Oregon

No. 3:21-cv-00090-HZ

OPINION & ORDER

Medical Board; ALI MAGEEHON,
in her official capacity as a member of
the Oregon Medical Board; CHERE
PEREIRA, in her official capacity as a
member of the Oregon Medical Board;
CHRISTOFFER POULSEN, in his
official capacity as a member of the
Oregon Medical Board; ANDREW
SCHINK, in his official capacity as a
member of the Oregon Medical Board;
JILL SHAW, in her official capacity as
a member of the Oregon Medical Board,

       Defendants.

Kristina S. Heuser
Kristina S. Heuser, P.C.
P.O. Box 672
Locust Valley, NY 11560

Mariah Gondeiro
Robert Todd Frahm
Tyler & Bursch, LLP
25026 Las Brisas Road
Murrieta, CA 92562

       Attorneys for Plaintiff

Christina L. Beatty-Walters
Marc Abrams
Oregon Department of Justice
100 SW Market Street6
Portland, OR 97201

       Attorneys for Defendant

HERNÁNDEZ, District Judge:

       Plaintiff Steven LaTulippe, M.D., brings this action against Defendants Kathleen Harder,

Saurabh Gupta, Erin Cramer, Robert Cahn, James Lace, Charlotte Lin, Patti Louie, Jennifer

Lyons, Ali Mageehon, Chere Pereira, Christopher Poulsen, Andrew Schink, and Jill Shaw in

their official capacities as members of the Oregon Medical Board for violation of his right to

equal protection and his First and Fourteenth Amendment rights. Defendants move to dismiss, for judgment on the pleadings, and for summary judgment. The Court holds that Defendants are immune from suit and dismisses this action with prejudice.

**BACKGROUND**

## I.    Facts

Plaintiff Steven Arthur LaTulippe, M.D., has been a physician for over twenty years. First Am. Compl. (FAC) ¶ 4, ECF 25. At all relevant times, Plaintiff owned and operated a medical clinic in Dallas, Oregon, called South View Medical Arts, where he practiced family medicine, urgent care, addiction treatment, and pain management. *Id*. ¶¶ 30–33. Plaintiff specializes in the treatment of central pain. *Id*. ¶ 32; LaTulippe Decl. ¶ 4, ECF 8-1.

The Oregon Medical Board (OMB) received a complaint that Plaintiff was not following Oregon Health Authority (OHA) requirements that masks be worn in all clinical settings and was not following social distancing requirements. On August 13, 2020, OMB initiated an investigation into Plaintiff's medical license based on reports that Plaintiff had advised members of the public not to wear masks and made social media posts to that effect. *Id*. ¶ 35; FAC Ex. A, ECF 25-1. OMB's investigator, Jason Carruth, advised Plaintiff in writing on August 13, 2020, that OMB had initiated an investigation in response to a complaint that Plaintiff was not following social distancing guidelines and had informed the public that masks are ineffective at preventing the spread of COVID-19 and discouraged people from using them. *Id*. The notice explained the nature of the investigation and asked Plaintiff to respond to the allegations and provide documents by September 3, 2020. *Id*.

Plaintiff responded to the OMB investigator's letter on August 31, 2020. FAC Ex. C, ECF 25-3. In his response, Plaintiff denied failing to follow "reasonable social-distancing

guidelines" in his practice and care of patients, admitted that he advised patients and the public that the masks required under the current guidelines do not work and should not be worn, and denied posting comments on social media discouraging individuals from adhering to social distancing guidelines. *Id.* The remainder of Plaintiff's response to the allegations advocated the reasons for his "conclusion that the mask affords minimal or no protection against viral upper respiratory infections." *Id*. His opinion stems from science indicating that the coronavirus has a diameter of 0.125 microns and even the best N-95 particulate mask is only able to filter particles that are 0.3 microns in diameter or larger. *Id*. Considering the reality that most people do not wear masks correctly, Plaintiff concluded that masks are a "worthless viral barrier." *Id*.

As evidence of the ineffectiveness of masks, Plaintiff encouraged the OMB to watch a fifty-minute YouTube video in which a career PPE expert explains why he believes that masks are ineffective.[1] *Id*. Plaintiff also explained his opinion that masks are "very dangerous" based on his observation that he sees far more patients for ailments related to mask wearing than patients with viral illness. *Id*. He also discussed politics, fearmongering, and questioned the authority of Governor Brown to issue executive orders relating to the declared state of emergency. *Id*. at 5. He concluded by saying that he "cannot compromise [his] personal integrity, moral standards, or [his] reputation as a caring and competent physician, for the sake of perpetuating a lie." *Id*. at 3.

On November 7, 2020, Plaintiff spoke at a "Stop the Steal" rally in Salem, Oregon, held in support of former President Donald Trump and discussed his opinions about the ineffectiveness of masks at preventing the spread of COVID-19. FAC ¶ 39. On November 9, 2020, OMB sent Plaintiff a letter informing him that he was in violation of the Governor's

---

[1] Plaintiff also prepared a handout for patients that directed his patients to watch this video. Carruth Decl. Ex. 2 at 6, 8.

executive orders and administrative guidance promulgated by OHA requiring the use of masks in clinical settings. *Id*. ¶ 30; Farris Decl. Ex. 1, ECF 17. The letter warned Plaintiff:

> Care that you provide to your patients that is not consistent with these standards may be found to be negligent and may also constitute unprofessional or dishonorable conduct in that it does or might constitute a danger to the health or safety of a patient or the public[] and may be subject to administrative sanctions.

FAC ¶ 40; Farris Decl. Ex. 1. Plaintiff alleges that the letter "marked the first communication by the OMB or any other entity with lawful authority over the practice of medicine that purported to set forth special rules that must be adhered to by medical practitioners in operating their practices in the COVID-19 era." FAC ¶ 41. Plaintiff responded to that letter on November 23, 2020. Farris Decl. Ex. 2. Plaintiff described his education and experience, his dedication to patient care, his experience treating COVID-19 patients, and his commitment to "maintain high standards of proven infectious disease prevention in [his] medical practice." *Id*. at 2. He did not address his alleged violation of the Governor's executive orders and OHA guidance requiring the use of masks in clinical settings. *Id*.

On or about December 2, 2020, an OMB investigator visited Plaintiff's medical clinic unannounced. FAC ¶ 43. Plaintiff alleges that the investigator, Jason Carruth, questioned Plaintiff about his office practices. *Id*. Mr. Carruth indicated that he spoke to Plaintiff and his staff when he visited Plaintiff's clinic. Carruth Decl. ¶ 7. Based on OMB's investigation, on December 3, 2020, OMB suspended Plaintiff's medical license. Mr. Carruth called Plaintiff to advise him of the suspension, which was effective immediately. FAC ¶ 44. The OMB issued an "Order of Emergency Suspension and Notice of Opportunity for Hearing" dated December 5, 2020. FAC ¶ 46; FAC Ex. D ("OMB Suspension Order"), ECF 25-4.

The OMB Suspension Order reveals the findings of its investigation as follows. "Patient A," a member of the Oregon Health Plan (OHP)[2], reported that on July 2, 2020, the patient contacted Plaintiff's clinic to obtain advice about whether and when to be tested for COVID-19. *Id*. ¶ 4.1. An employee of Plaintiff's clinic told Patient A that the patient should not self-isolate "because being around other people would provide Patient A with immunity to COVID-19." *Id*. Patient A questioned the appropriateness of that advice and reported to OMB that the patient was dismissed as a patient from Plaintiff's medical clinic a few weeks later. *Id*.

The OMB Suspension Order indicates that Plaintiff and his staff refused to wear masks in the clinic and urged persons who entered the clinic wearing masks to remove their masks. *Id*. ¶ 4.2. Plaintiff admits that he and his staff did not wear masks in his clinic unless a patient exhibited symptoms suspicious for COVID-19. LaTulippe Decl. ¶ 8; FAC ¶ 69. Plaintiff denies that he or his staff told anyone to remove their masks. FAC ¶ 74. The OMB Suspension Order also indicates that Plaintiff told his patients that masks are ineffective at preventing the spread of COVID-19, that respiratory particles can pass through N95 masks and other face coverings, directed patients to a YouTube video providing false information about masks, and advised his patients that wearing a mask is "very dangerous" for elderly and pediatric patients because masks exacerbate COPD and asthma and cause or contribute to multiple serious health conditions such as heart attacks, strokes, collapsed lungs, MRSA, pneumonia, and hypertension. OMB Suspension Order ¶¶ 4.3–4.4. OMB also found that Plaintiff believed that masks are harmful to patients due to their tendency to increase the body's carbon dioxide content. *Id*. Posted in the waiting room of Plaintiff's clinic was a notice stating that 94% of individuals who experience

---

[2]OHP is the plan that administers the state's Medicaid benefits to qualifying low-income individuals. OHP recipients "have limited or no ability to transfer their care to another healthcare provider." OMB Suspension Order ¶ 3.7.

serious effects of COVID-19 have co-morbidities and a printed list of warning signs of carbon dioxide toxicity. *Id*. ¶ 4.7; Carruth Decl. Ex. 3.

Plaintiff's COVID-19 protocol provides that patients with severe presumptive COVID-19 symptoms should be sent to the emergency department. FAC Ex. G ¶ 1, ECF 25-7. The clinic's protocol required maintaining a six-foot distance between all patients, minimizing contact with and between patients, using a one-way entry and exit for patients, allowing only one patient per room, thoroughly sanitizing rooms between patients, and handwashing before and after each patient contact. *Id*. ¶¶ 2–5, 7, 10. It also provided that the clinic staff should "[d]on a mask on any patient with a cough, fever, or any suspicious viral illness." *Id*. ¶ 6. Plaintiff's COVID-19 treatment protocol outlined medications to prescribe for certain COVID-19 symptoms and directed staff to "[i]nstruct on contact precautions to reduce infectivity." FAC Ex. E, ECF 25-5. Although not listed on his written COVID-19 protocol, Plaintiff alleges that he scheduled all COVID-19 patients at the end of the day when no other patients were at his office and that his staff cleaned and sterilized the designated COVID-19 examination room after each visit. FAC ¶¶ 69–72. LaTulippe Decl. ¶ 10.

OMB found that Plaintiff's COVID-19 protocols were inadequate in several respects. Plaintiff required patients and staff to wear masks only if they presented with COVID-19 symptoms or other symptoms suspicious for viral illness. OMB Suspension Order ¶ 4.5. OMB's investigator observed on December 2, 2020, that patients and health providers at Plaintiff's clinics were not wearing masks, no screening procedures such as taking body temperatures on entry were in place, and no hand sanitizer was present in the waiting area. *Id*. ¶ 4.7.

Plaintiff alleges that his clinic kept hand sanitizer at the reception desk, to prevent theft, and a common area that patients pass through after exiting exam rooms. FAC ¶ 76. He also

alleges that no known or reported person-to-person COVID-19 transmission has originated from his clinic. LaTulippe Decl. ¶ 8; FAC ¶ 77.

OMB issued its decision to suspend Plaintiff's medical license on an emergency basis under Or. Rev. Stat. §§ (O.R.S.) 677.205(3) and 183.430(2) because it found that Plaintiff's continued practice "constitutes an immediate danger to the public" and "presents a serious danger to the public health or safety." OMB Suspension Order 1. OMB reasoned that because patients with COVID-19 will inevitably enter Plaintiff's clinic during the pandemic, those patients "present a clear and present health risk to other patients and staff" and Plaintiff's "active discouragement of mask wearing by patients and staff . . . represent[s] a failure to take appropriate steps to reduce the risk of transmission, thereby posing an unnecessary and preventable risk to patients, staff, and [Plaintiff.]" *Id.* ¶¶ 5.2–5.3. OMB found that Plaintiff's "instruction and example to patients to shun masks actively promotes transmission of the virus within the extended community," and his advice to patients conflicted with basic principles of epidemiology and physiology and undermined the acceptance of measures recommended to prevent the transmission of COVID-19 among his patients and the greater community. *Id.* ¶¶ 5.4–5.5. OMB also found that because OHP patients have a limited ability to transfer their care to another provider, many of Plaintiff's OHP patients were forced to endure Plaintiff's unsafe practices while his license remained active. *Id.* ¶ 5.6.

The OMB Suspension Order advised that Plaintiff had a right to a hearing if he requested a hearing within ninety days. OMB Suspension Order 7. It included a "Notice of Rights" section in which it advised Plaintiff that he had a right to a formal hearing if he requested one in writing, and he had the right to demand that the hearing be held as soon as practicable after the Board received his written request for a hearing. *Id.* ¶ 6. Plaintiff's counsel requested a hearing on

Plaintiff's behalf. Foote Decl. ¶ 3, ECF 18; Foote Decl. Ex. 1 at 2, ECF 18. OMB held a hearing concerning Plaintiff's license suspension on March 15–19 and March 24, 2021. Heuser Decl. Ex. 1–6, ECF 31.

## II.    Procedural History

Plaintiff filed a first amended complaint on March 15, 2021. On March 18, 2021, Defendants filed a motion under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiff's Fourteenth Amendment procedural due process claim. Defs. Part. Mot. Dismiss 2 (MTD I), ECF 26. On July 8, 2021, Defendants filed a second motion to dismiss seeking dismissal for lack of subject matter jurisdiction or, alternatively, judgment on the pleadings or summary judgment on Plaintiff's equal protection and First Amendment claims. Defs. Mot. Dismiss for Lack of Jurisdiction (MTD II) 1, ECF 37. Defendants then filed a third motion to dismiss Plaintiff's claims for declaratory and injunctive relief under Fed. R. Civ. P. 12(b)(1), arguing that Plaintiff's equitable claims are moot. Defs. Mot. Dismiss as Moot (MTD III) 2, ECF 44. All three motions are presently before the Court.

## STANDARDS

## I.    Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When evaluating the sufficiency of a complaint's factual allegations, the court must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Id.* (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a complaint must state a plausible claim for relief and contain "well-pleaded facts" that "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 679.

## II.    Motion for Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." *Fed. R. Civ. P. 12(c)*. "[T]he same standard of review applicable to a *Rule 12(b)* motion applies to its Rule 12(c) analog," because the motions are "functionally identical." *Dworkin v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). In reviewing a motion brought under Rule 12(c), the Court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). The Court will grant a motion for judgment on the pleadings if there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *Id.* A *Rule 12(c)* motion may be based on either (1) the lack of a cognizable legal theory, or (2) insufficient facts to allege a cognizable claim. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019).

III.    **Motion for Summary Judgment**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Defendants move to dismiss Plaintiff's Second Cause of Action alleging violation of his right to procedural due process under the Fourteenth Amendment and moves to dismiss all Plaintiff's claims for lack of jurisdiction or, alternatively for judgment on the pleadings or summary judgment on Plaintiff's First Amendment and Equal Protection Clause claims. MTD I at 2; MTD II at 2.

## I.      Procedural Question

Plaintiff argues that the Court should not decide Defendants' second motion to dismiss— presented as a lack of subject matter jurisdiction based on Defendants' absolute immunity to Plaintiff's claims—because Defendants failed to make the motion within twenty-one days of Plaintiff filing the Amended Complaint and waived the arguments by failing to raise them in their first motion to dismiss. Pl. Resp. to MTD II at 9, ECF 41.

Fed. R. Civ. P. 12(h) provides that a party waives a defense listed in Fed. R. Civ. P. 12(b)(2)–(5) by failing to raise it in a motion under Rule 12 or including it in a responsive pleading. There is no dispute that Defendants did not raise their absolute judicial immunity defense in their initial motion to dismiss. However, Defendants' absolute judicial immunity defense is not one of the defenses listed under Rule 12(b)(2)–(5). Rule 12(b)(2)–(5) pertains only to motions to dismiss based on lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process. Fed. R. Civ. P. 12(b)(2)–(5). Because Rule 12(h)

provides only that a defense that falls under Rule 12(b)(2)–(5) is waived by failing to raise it in a first Rule 12 motion, Rule 12(h) does not compel the conclusion that Defendants waived their absolute judicial immunity defense by failing to raise it in their first motion to dismiss.

Plaintiff also argues that the Court should deny Defendants' motion under Fed. R. Civ. P. 12(g)(2). That rule provides that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Fed. R. 12(h)(2) and (3) provide that motions made under Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction) can be made at any time, and that failure to state a claim, failure to join a party under Rule 19, or "a legal defense to a claim" may be raised (1) in an answer or other pleading allowed under Rule 7(a), (2) in a motion under Rule 12(c), or (3) at trial. Defendants' assertion that they are entitled to absolute judicial immunity from Plaintiff's claims is a legal defense to a claim.[3] Thus, it is a defense that Defendants are entitled to raise in their answer or responsive pleading, which Defendants are not yet required to file; a Rule 12(c) motion for judgment on the pleadings; or at trial. Accordingly, Defendants did not waive their judicial immunity defense by failing to raise it in their first Rule 12 motion.

However, Rule 12(g)(2) is not limited to motions brought under Rule 12(b)(2)–(5), it applies to all motion brought under Rule 12. Under Rule 12(g)(2), defendants generally cannot

---

[3]Defendants styled their second motion to dismiss as a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), but judicial immunity is properly considered under Rule 12(b)(6), as a motion to dismiss for failure to state a claim. *See Mullis v. U.S. Bankr. Ct. for Dist. of Nev.*, 828 F.2d 1385, 1388 (9th Cir. 1987); *see also* 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed.) ("judicial immunity has also been held to be properly raised via Rule 12(b)(6) rather than Rule 12(b)(1), although one can find courts not being too particular about the distinction.").

raise their judicial immunity defense in a second motion to dismiss because it was available to

defendants at the time that they filed their first motion to dismiss. Because Defendants did not

raise it within twenty-one days of Plaintiff filing the First Amended Complaint and did not raise

it in their first Rule 12 motion, it is now untimely. However, in "in light of the general policy . . .

expressed in Rule 1" the Ninth Circuit is "generally. . . forgiving of a district court's ruling on

the merits of a late-filed Rule 12(b)(6) motion." *In re Apple iPhone Antitrust Litig.*, 846 F.3d

313, 319 (9th Cir. 2017). Especially where denying the motion under Rule 12(g)(2) would

produce costly and unnecessary delays and the late motion was not "filed for any strategically

abusive purpose." *Id.* at 320. Here, delaying resolution of the judicial immunity question until "a

pleading under Rule 7(a), a post-answer motion to dismiss on the pleadings under Rule 12(c), or

a defense asserted at trial" would "substantially delay" the disposition of this case for "no

apparent purpose," to the detriment of both parties. *See id.* And there is no indication that

Defendant's late-filing was a strategic choice. So, because it is dispositive of this action, the

Court will consider the judicial immunity argument raised in Defendants' successive motion to

dismiss.[4]

## II.     Absolute Judicial Immunity

Defendants argue that they are entitled to absolute judicial immunity from all Plaintiff's

claims. Judicial immunity bars suits seeking damages for acts committed by a judge within their

judicial discretion. *See Cleavinger v. Saxner*, 474 U.S. 193, 199 (1985). "This immunity reflects

the long-standing 'general principle of the highest importance to the proper administration of

---

[4]Plaintiff is correct that a motion for judgment on the pleadings is premature at this stage. A motion for judgment on the pleadings may be brought "[a]fter the pleadings are closed[.]" Fed. R. Civ. P. 12(c). Since Defendants have not yet filed an answer, the pleadings are not closed, and a motion for judgment on the pleadings is premature.

justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon

his own convictions, without apprehension of personal consequences to himself.'" *Olsen v.*

*Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004) (quoting *Bradley v. Fisher*, 13 Wall.

335, 347 (1871)). "Absolute immunity aids in the 'discouragement of collateral attacks, thereby

helping to establish appellate procedures as the standard system for correcting judicial error.'"

*Id.* at 928–29 (quoting *Buckles v. King Cnty.*, 191 F.3d 1127, 1136 (9th Cir. 1999)). "Judicial

immunity only applies to judicial acts, and not to the 'administrative, legislative, or executive

functions that judges may on occasion be assigned by law to perform." *Lund v. Cowan*, 5 F.4th

964, 971 (9th Cir. 2021). Judicial immunity is an immunity from suit, not just the award of

damages. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). Judicial immunity applies "even when the

judge is accused of acting maliciously and corruptly." *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

A.    OMB and Absolute Judicial Immunity

Courts have extended absolute immunity to qualifying state officials sued under § 1983

whose actions are functionally comparable to the actions of a prosecutor or judge. *Olsen*, 363

F.3d at 923 (citing *Butz v. Economou*, 438 U.S. 478, 512 (1978)). Determining whether a state

official's actions are functionally comparable to the actions of a prosecutor or judge—the

"functional approach"—requires considering several non-exclusive factors. Those factors, first

announced in *Butz*, include "(a) the need to assure that the individual can perform his [or her]

functions without harassment or intimidation; (b) the presence of safeguards that reduce the need

for private damages actions as a means of controlling unconstitutional conduct; (c) the

[agency's] insulation from political influence; (d) the importance of precedent; (e) the adversary

nature of the process; and (f) the correctability of error on appeal." *Cleavinger*, 474 U.S. at 202

(citing *Butz*, 438 U.S. at 512). After determining that the *Butz* factors have been met, the court

then considers whether the official's actions "are judicial or closely associated with the judicial process." *Mishler v. Clift*, 191 F.3d 998, 1007 (9th Cir. 1999).

In *Mishler v. Clift*, the Ninth Circuit addressed the question of whether members of the Nevada medical board were entitled to absolute judicial immunity under the functional approach. Considering the *Butz* factors listed above, the court concluded that the members of the Nevada medical board were entitled to absolute judicial immunity "for the acts they perform which are closely associated with the judicial process." *Id.* at 1009. The court determined that the Board's acts—holding hearings, taking evidence, adjudicating facts, and signing a disciplinary complaint against the plaintiff—"are functions that are inherently judicial in nature" and within the scope of absolute judicial immunity. *Id.* at 1008–09. Similarly, in *Olsen*, the Ninth Circuit held after analyzing the actions of the Idaho medical board under the *Butz* factors that the Idaho medical board was entitled to absolute immunity for their actions which were closely associated with the judicial process because the medical board "function[s] in a sufficiently judicial and prosecutorial capacity to entitle [it] to absolute immunity." 363 F.3d at 924–26. The court explained:

> The BOPD's letter indicating its intent to deny reinstatement, the Board's decision not to hold a further hearing, the Board's final order denying her license reinstatement, and the Board's denial of her motion for reconsideration were each procedural steps involved in the eventual decision denying Olsen her license reinstatement. Such acts are inextricably intertwined with appellees' statutorily assigned adjudicative functions and are entitled to the protections of absolute immunity.

*Id.* at 928.[5]

_____

[5] Several other circuits have found that members of state medical boards are entitled to absolute judicial immunity for acts associated with disciplinary proceedings. *See Wang v. N.H. Bd. of Registration in Med.*, 55 F.3d 698, 702 (1st Cir. 1995) (holding that medical board's counsel was entitled to absolute immunity for investigation surrounding disciplinary complaint); *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490–91 (10th Cir. 1991) (same); *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 782–83 (1st Cir. 1990) (holding that board officials are

A court in this district determined that members of the Oregon Medical Board (formerly the Board of Medical Examiners) are entitled to absolute judicial immunity from a § 1983 suit arising from judicial acts performed during medical license revocation proceedings. *Gambee v. Williams* (*Gambee I*), 971 F. Supp. 474, 477 (D. Or. 1997). In *Gambee I* the court concluded that medical board members "are absolutely immune with regard to acts performed in their statutory capacity as quasi-judicial prosecutors or judges." *Id.*

In a later case involving the same plaintiff, a court in this district again found that members of OMB were absolutely immune from suit for actions that were judicial or closely associated with the judicial process. *Gambee v. Cornelius* (*Gambee II*), Civil No. 10-6265-AA, 2011 WL 1311782, at *5 (D. Or. Apr. 1, 2011). The court then looked to the actions which the plaintiff alleged had violated his constitutional rights to determine whether those actions were judicial or closely associated with the judicial process. *Id.* Gambee had alleged that OMB violated his due process and equal protection rights when OMB investigated him and eventually revoked his medical license. *Id.* at *1. The court found that the plaintiff's claims all stemmed from OMB's exercise of their investigatory authority and their ultimate resolution of the disciplinary dispute concerning the plaintiff's medical license, which were akin to judicial functions such that OMB members were entitled to absolute immunity. *Id.* at 5. As a result, the court determined that the scope of the OMB members' absolute immunity encompassed all the plaintiff's claims and dismissed the plaintiff's complaint.

OMB is like the medical boards in *Olsen* and *Mishler*. Under Oregon's statutory scheme governing OMB, it has authority to investigate complaints and suspected licensing violations.

---

absolutely immune from suit by physician whose license was revoked); *Horwitz v. State Bd. of Med. Exam'rs*, 822 F.2d 1508, 1515 (10th Cir. 1987) (holding that medical board members are entitled to absolute immunity).

O.R.S. 677.320(1). That statute also authorizes taking evidence and depositions, compelling the appearance of witnesses, requiring answers to interrogatories, and inspecting books, papers and documents. O.R.S. 677.320(2). OMB also had statutory authority to suspend, revoke, or refuse to grant a license under certain enumerated circumstances. O.R.S. 677.190. Acting under that authority, OMB investigates complaints it receives and can take action to suspended licenses to practice medicine if it concludes there was unprofessional or dishonorable conduct, one of the bases for suspending or revoking a medical license enumerated in O.R.S. 677.190. O.R.S. 677.190(1)(a). As in *Olsen*, these functions need protection from "harassment and intimidation." 363 F.3d at 924. And OMB includes public members, insulating it from political influence. *See id.* Further, Oregon law provides safeguards by allowing physicians to contest OMB's decision before an administrative law judge and to petition the Oregon Court of Appeals for review of the administrative law judge's decision, which Plaintiff did. *See* O.R.S. 677.208; *In re Mintz*, 233 Or. 441, 446, 378 P.2d 945, 947 (1963). Thus, like in *Olsen* and *Mishler*, where the Ninth Circuit accorded judicial immunity to Idaho and Nevada medical boards, the *Butz* factors weigh in favor of conferring judicial immunity to OMB.

The Court finds that Defendants are entitled to absolute judicial immunity from Plaintiff's claims. OMB acts as a quasi-judicial body with respect to license disciplinary actions. *See Mishler*, 191 F.3d at 1008 ("There is no question that acts occurring during the disciplinary hearing process fall within the scope of absolute immunity[.]"). As a result, Defendants are entitled to absolute judicial immunity for judicial acts and those closely associated with the judicial process. *Olsen*, 363 F.3d at 925–26. Plaintiff's FAC alleges that Defendants violated Plaintiff's right to procedural due process when they suspended his license without a hearing, violated his First Amendment rights by suspending his license in retaliation for his speech and

expression, and violated his Fourteenth Amendment right to equal protection when they treated Plaintiff differently from other licensed physicians by "suspending his license because he expressed a well-founded viewpoint on a matter of public concern that differed from the prevailing narrative being promulgated by those presently in control of the medical establishment." FAC ¶¶ 97–98, 103–07, 110–12. Each of those claims allege that Defendants violated Plaintiff's constitutional rights during the board members' performance of OMB's statutorily authorized judicial functions of initiating, investigating, and adjudicating disciplinary action against Plaintiff. Plaintiff does not argue that any act that caused his alleged constitutional violations was administrative or ministerial such that it does not fall within the scope of absolute judicial immunity. As a result, Defendants are absolutely immune from Plaintiff's claims for money damages in this case.

      B.     OMB's Jurisdiction

Plaintiff argues that absolute immunity does not apply because OMB lacked jurisdiction to enforce Governor Brown's statewide mask mandate. Exceptions to the absolute immunity of judges or those acting in a judicial capacity from suit include: (1) nonjudicial acts (defined as "actions not taken in the judge's judicial capacity") and (2) acts, "though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11–12.

Plaintiff's argument that OMB lacked jurisdiction to enforce Governor Brown's mask mandate fails to identify the correct act for purposes of the immunity analysis. First, Plaintiff's FAC does not allege that OMB suspended Plaintiff's medical license to enforce the Governor's executive orders, it alleges that OMB "concluded that . . . Dr. LaTulippe 'engaged in unprofessional conduct or dishonorable conduct, as defined in ORS 677.188(4)(a)[.]'" FAC ¶ 56.

Second, Defendants' action to suspend Plaintiff's medical license was not "taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 12. Plaintiff concedes that OMB had the authority to investigate medical licensees and to suspend a medical license if the licensee engages in unprofessional or dishonorable conduct. Pl. Resp. MTD II at 12, ECF 41 (citing O.R.S. 677.320 and O.R.S. 677.190). OMB is authorized to suspend a medical license without a hearing "if the board finds that evidence in its possession indicates that a continuation in practice of the licensee constitutes an immediate danger to the public." O.R.S. 677.205(3). Similarly, O.R.S. 183.430(2) authorizes OMB to suspend a medical license without a hearing if OMB "finds a serious danger to the public health or safety and sets forth specific reasons for such findings[.]" The core disagreement between the parties is whether Plaintiff engaged in unprofessional or dishonorable conduct or Plaintiff created a serious danger to the public health or safety through his continued licensure by failing to follow OHA guidelines implemented to prevent the spread of COVID-19. It was thus within OMB's statutory authority to suspend Plaintiff's license after an investigation revealed facts that led OMB to conclude that Plaintiff had engaged in unprofessional or dishonorable conduct or created a danger to the public health or safety when he refused to follow OHA guidelines. As a result, OMB did not act in the complete absence of all jurisdiction, and Defendants are entitled to absolute judicial immunity from Plaintiff's claims for damages.

C.     Claims for Declaratory and Injunctive Relief

Plaintiff argues that absolute judicial immunity, even if it applies, does not bar Plaintiff's claims for declaratory and injunctive relief. Section 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief

was unavailable." 42 U.S.C. § 1983. Plaintiff did not allege that Defendants violated a declaratory decree or that declaratory relief was unavailable. As a result, Plaintiff's claim for injunctive relief does not fall within the narrow set of circumstances set forth in § 1983. *See Just. Network, Inc. v. Craighead Cnty.*, 931 F.3d 753, 763 (8th Cir. 2019).

The text of § 1983 does not explicitly bar claims for declaratory relief. The Ninth Circuit has yet to decide whether claims for declaratory relief may be brought under § 1983. *Lund*, 5 F.4th at 970 n.2 (noting that the plaintiff urged the court to hold that § 1983 does not bar claims for declaratory relief against judges and that the court "leave[s] that question for another day."). Other circuits have held that § 1983 does not bar prospective declaratory relief against judges. *See Just. Network*, 931 F.3d at 763 ("Currently, most courts hold that the [1996] amendment to § 1983 does not bar declaratory relief against judges.") (surveying cases).

The Tenth Circuit explained that "[a] declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act." *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 (10th Cir. 2008) (emphasis added). Following *Lawrence*, the Eighth Circuit held that "[a] complaint 'seeking . . . a declaration of past liability' against a judge instead of 'future rights' does not satisfy the definition of 'declaratory judgment' and renders declaratory relief unavailable." *Just. Network*, 931 F.3d at 764 (quoting *Lawrence*, 271 F. App'x at 766). The Eighth and Tenth Circuits thus concluded that § 1983 provides only for prospective—not retrospective—declaratory relief. *Just Network*, 931 F.3d at 764; *Lawrence*, 271 F. App'x at 766.

The Court is persuaded by the decisions of the Eighth and Tenth Circuits in *Justice Network* and *Lawrence*. Plaintiff's claims for declaratory relief seek only retrospective declaratory relief. Plaintiff seeks a declaratory judgment declaring that "Defendants' suspension

of [Plaintiff's] license in the manner described herein violated" Plaintiff's procedural due process rights, First Amendment rights, and right to equal protection under the law. FAC Prayer for Relief ¶¶ 1–3. As a result, the Court finds that Plaintiff's claim for retrospective declaratory relief is not cognizable under § 1983. *See Network*, 931 F.3d at 764 (explaining that a "complaint seeking a declaration of past liability against a judge instead of future rights does not satisfy the definition of declaratory judgment and renders declaratory relief unavailable." (cleaned up)).

## III.    Leave to Amend

Plaintiff argues that if the Court decides that judicial immunity bars Plaintiff's claims against Defendants, then the Court should allow Plaintiff leave to amend the complaint to substitute the Oregon Attorney General, Governor, and appropriate public health officials in place of the current Defendants "since Plaintiff challenges the constitutionality of the Executive Orders, Public Health Orders, and entire statutory scheme that led to the suspension of his medical license." Pl. Opp'n MTD II at 17. However, Plaintiff has raised no such claims challenging the constitutionality of any executive order, public health order, or statute in this case. The amendment Plaintiff proposes would assert different claims against different defendants and should be brought in a separate action. Plaintiff proposes no amendment to the claims against these Defendants that would survive judicial immunity. As a result, the Court finds that amendment would be futile. Accordingly, the Court denies leave to amend. *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018) ("Leave to amend may be denied if amendment would be futile[.]").

## CONCLUSION

The Court GRANTS Defendants' Motion to Dismiss for Lack of Jurisdiction, for

Judgment on the Pleadings, and for Summary Judgment [37] based on judicial immunity. All

remaining motions pending before the Court are denied as moot.

IT IS SO ORDERED.


DATED: __November 23, 2021____.



MARCO A. HERNÁNDEZ
United States District Judge